Value Health Sols., Inc. v. Pharm. Rsch. Assocs., 2021 NCBC 24A.

STATE OF NORTH CAROLINA

COUNTY OF WAKE

VALUE HEALTH SOLUTIONS
INC. and NAGARAJAN
PARTHASARATHY,

          Plaintiffs,

    v.

PHARMACEUTICAL
RESEARCH ASSOCIATES, INC.
and PRA HEALTH SCIENCES,
INC.,

          Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
18-CV-12318


**ORDER AND OPINION ON MOTIONS
FOR SUMMARY JUDGMENT**

THIS MATTER comes before the Court on Defendants Pharmaceutical Research Associates, Inc. ("PRA, Inc.") and PRA Health Sciences, Inc.'s ("PRAHS"; collectively, Defendants will be referred to as "PRA," in the singular, except as otherwise required) Motion for Summary Judgment ("PRA's Motion," ECF No. 110) and Plaintiffs Value Health Solutions Inc. ("VHS") and Nagarajan Parthasarathy's ("Parthasarathy") Motion for Summary Judgment. ("Plaintiffs' Motion," ECF No. 115; collectively, PRA's Motion and Plaintiffs' Motion are the "Motions").

THE COURT, having considered the Motions, the evidence filed by the parties, the briefs submitted in support of and in opposition to the Motions, the arguments of counsel at the hearing on the Motions, the applicable law, and other appropriate matters of record, CONCLUDES that PRA's Motion should be GRANTED, and Plaintiffs' Motion should be GRANTED, in part, and DENIED, in part.

*Mainsail Lawyers, by David Glen Guidry and Joseph Kellam Warren, for Plaintiffs Value Health Solutions Inc. and Nagarajan Parthasarathy.*

*Barnes & Thornhill, LLP, by John M. Moye, and Allen R. Baum, and Kilpatrick Townsend & Stockton LLP, by Joe P. Reynolds, for Defendants Pharmaceutical Research Associates, Inc. and PRA Health Sciences, Inc.*

McGuire, Judge.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

1.     This matter arises from bitter disputes between the parties surrounding PRA's acquisition of VHS, its proprietary software, and Parthasarathy's employment. The action was filed in October 2018, and the parties engaged in lengthy and extensive discovery involving the taking of at least seventeen depositions and the exchange of many thousands of documents. During the litigation the parties sought numerous orders sealing documents filed with the Court. Unfortunately, in presenting the Motions to the Court, the parties have filed hundreds of individual exhibits consisting of thousands of pages. The exhibits were filed in six[1] separate filings, some of which consisted of dozens of individual exhibits contained in a single, multi-hundred page and unindexed .pdf file. As a result, the Court's review of the record has been exceedingly difficult and time consuming. To expedite ruling on the Motions and to simplify reference to the evidence in the record, the Court has chosen to limit citation to the record to the extent possible and, in many cases, cites to those portions of the parties' briefs containing reference to the relevant evidence rather than the exhibits containing the evidence.

---

[1] The six filings include only the public, redacted filings, and not the companion sealed filings.

### A. The Parties

2.      PRA is a large, publicly traded, contract research organization ("CRO") that provides a range of clinical trial services to large pharmaceutical companies and biotechnology companies around the globe.  PRA is headquartered in Raleigh, North Carolina, employs more than 17,500 employees worldwide, and has participated in approximately 4,000 clinical trials across the globe, resulting in the regulatory approval of over 95 drugs.  At all times relevant to this matter, Colin Shannon ("Shannon") was PRA's Chief Executive Officer, and Mike Irene ("Irene") was PRA's Executive Director of IT.  (PRA's Br. Supp. of Mot. For SJ, ECF Nos. 111 [SEALED] and 113 [Public], at p. 1.)

3.      PRA uses clinical trial management software ("CTMS") to assist its customers with clinical trials.  The CTMS used by PRA is critical to the services PRA provides to its customers.  In 2014, PRA was using a CTMS system created by Seibel.  (*Id.*)

4.      Parthasarathy founded VHS.  In 2013, VHS developed a set of clinical trial software applications called ClinTrial Max ("CTMax"), Cloud Max, and Info Max (collectively, the "Solutions").  CTMax was a Salesforce®-based CTMS.  (*Id.* at p. 2; Plfs.' Br. Supp. Mot. For SJ, ECF Nos. 116 [SEALED] and 117.1 [Public], at pp. 2–3.)

### B. PRA's Acquisition of the Solutions

5.      In 2014 PRA's IT department was pursuing a transition to a Salesforce® environment.  In April 2014, PRA approached Parthasarathy about acquiring CTMax, and Plaintiffs and PRA subsequently engaged in a year-long period of

negotiation and due diligence aimed at PRA's acquisition of the Solutions. In addition to negotiating over PRA's purchase of the Solutions in order to integrate the software into PRA's clinical trial management environment, Shannon and Parthasarathy discussed the potential for selling a stand-alone CTMS software to PRA's customers. (ECF Nos. 111/113, at pp. 2–3.)

6. Between April and October 2014, as part of the due diligence process, VHS provided PRA full access to the software code for CTMax, and PRA performed testing and analysis to understand its functionality. This included a gap analysis which allowed PRA to learn CTMax's capabilities and identify the functions that PRA wanted to further develop after acquiring the software. In doing so, it became clear that CTMax had several functional gaps compared to other CTMS applications in the industry, including the ███████ CTMS then in use by PRA, and PRA advised Parthasarathy of these gaps. (*Id.* at p. 3.) In July 2014, Irene prepared a list of key product enhancements that PRA would need to "close the gap between CTMax and [PRA's] current CTMS." (*Id.*)

     i.   <u>The Letter of Intent</u>

7. On October 15, 2014, PRA's Health Executive Vice President and Chief Financial Officer, Linda Baddour, sent Parthasarathy a document titled "Non-Binding Letter of Intent" ("LOI"). (ECF No. 5, at Ex. A.) The LOI outlined PRA's proposal for the acquisition of the Solutions including, *inter alia,* as follows:

> **a.** PRA would make a one-time, up-front payment to Plaintiffs of between $1 million and $3 million;
>
> **b.** PRA would make incentive payments of $333,000 each conditioned upon successful completion of three

separate "Integration Milestones," described as (i) "Integrated Salesforce Environments," (ii) "Key Product Enhancements," and (iii) "CTMS Studies Migrated to ClinTrial Max" within 18 months following the closing of the transaction; and

c. PRA would make future incentive payments to Plaintiffs for achieving "Performance Milestones" regarding external sales of "licenses for VHS offerings" as follows:

  i. a payment of $2.5 million for reaching $25 million in annual sales within two years of closing;

  ii. a payment of $5 million for reaching $50 million in annual sales within three years of closing;

  iii. a payment of $7.5 million for reaching $75 million in annual sales within four years of the closing; and

  iv. payment of a one percent (1%) annual royalty on sales for an additional four years after the $75 million sales amount is reached.

(*Id*. at pp. 4–5.)

8. The LOI also stated as follows:

It is understood that this letter merely constitutes a statement of the intentions of the parties with respect to a potential Transaction, and does not contain all matters upon which agreement must be reached in order for a definitive agreement to be finalized or for the Transaction to be consummated. Except for sections 3 through 8 of this LOI, which shall be legally binding in accordance with their respective terms, neither this LOI nor the acceptance thereof is intended to, nor shall it, create a binding legal obligation, or any obligation by any of the parties hereto to enter into any Transaction, negotiate or take any other action in contemplation thereof, or executive any definitive agreements. The parties further acknowledge and agree that, except as otherwise provided in the immediately preceding sentence, none of this LOI, any proposal made to

the Company, nor the current on-going discussions between the parties are intended to (and shall not) create a legally binding obligation or commitment on the part of any party with respect to the negotiation or completion of the Transaction.

. . .

(*Id*. at p. 2.) The copy of the LOI provided in the record is not signed by VHS or Parthasarathy, but Plaintiffs do not dispute that they entered into the LOI.

### ii. The Asset Purchase Agreement

9. Effective May 21, 2015, PRA, VHS, and Parthasarathy entered into an Asset Purchase Agreement ("APA") for the purchase of the Solutions. (ECF No. 112.1, at pp. 348–416.) The APA is governed by Delaware law.

10. Under the APA, Plaintiffs agreed to sell the Solutions to PRA for a payment of PRA stock and cash of approximately $2.5 million at closing, and potential "Contingent Payments" tied to achievement of certain milestones. (*Id*. at pp. 351–52.) The first group of contingent payments were three separate payments dependent on, respectively: the integration of CTMax into PRA's clinical trial management environment; the completion of the product enhancements to ▮▮▮▮ identified by the gap analysis; and completion of the migration of PRA clinical trial studies into CTMax ("Development Milestones"). (*Id*. at pp. 351, 387–90.) More specifically, Article 2.6 of the APA provides:

> Milestones. As additional consideration for the transactions contemplated hereby, and subject to the terms of this Section 2.6, Purchaser shall make (or PRAHS shall make on Purchaser's behalf) the following payments (each, a "Contingent Payment"):

(i)     upon completion of the integration of the parties' Salesforce™ environments set forth on <u>Schedule 2.6(a)(i)</u>, PRAHS shall issue to Seller (or as otherwise directed by Seller's Representative), within thirty (30) days after such completion, that number of shares of PRA Common Stock equal in value to Three Hundred Thirty-Three Thousand U.S. Dollars ($333,000.00), based on the Fair Market Value as of the date of issuance of such shares; <u>provided</u>, <u>however</u>, that completion occurs within the first consecutive eighteen (18) months from the Effective Time[2] (the "<u>Integration Period</u>");

(ii)    upon completion of the key product enhancements set forth on Schedule 2.6(a)(ii). PRAHS shall issue to Seller (or as otherwise directed by Seller's Representative), within thirty (30) days after such completion, that number of shares of PRA Common Stock equal in value to Three Hundred Thirty-Three Thousand U.S. Dollars ($333,000.00), based on the Fair Market Value as of the date of issuance of such shares; provided, however, that completion occurs within the Integration Period;

(iii)   upon completion of the migration of the clinical trial management systems studies of Purchaser and its Affiliates into ClinTrial Max as set forth on Schedule 2.6(a)(iii), PRAHS shall issue to Seller (or as otherwise directed by Seller's Representative), within thirty (30) days after such completion, that number of shares of PRA Common Stock equal in value to Three Hundred Thirty-Three Thousand U.S. Dollars ($333,000.00), based on the Fair Market Value as of the date of issuance of such shares; provided, however, that completion occurs within the Integration Period[.]

(*Id*. at pp. 351–52; emphasis in original.)  Schedules 2.6(a)(i)–(iii) to the APA provide further detail as to the requirements for achieving each of the Development

---

[2] The "Effective Time" is defined in the APA as 11:59 p.m. (EST) on the Closing Date.  *Id*. at p. 353.)

Milestones and state that each Development Milestone "shall be deemed completed . . . as reasonably determined by [PRA]." (*Id.* at pp. 387–90.)

11. The second group of contingent payments provided for in the APA were conditioned on PRA achieving certain levels of "External Sales" of licenses to the Solutions within four years following the Closing ("Sales Milestones;" collectively the Sales Milestones and the Development Milestones are the "Milestones"). (*Id.* at pp. 352, 374.) Article 2.6 of the APA provides:

> (iv) upon the achievement of aggregate External Sales equal to Twenty Five Million U.S. Dollars ($25,000,000), Purchaser shall make, within thirty (30) days following the date on which PRAHS files its next quarterly report with the United States Securities and Exchange Commission (the "SEC") after such achievement, a cash payment of Two Million Five Hundred Thousand U.S. Dollars ($2,500,000.00) to Seller (or as otherwise directed by Seller's Representative) (the "First Milestone Payment"); provided, however, that such achievement occurs prior to the second (2nd) anniversary of the Closing Date (the "First Milestone Period");
>
> (v) upon the achievement of aggregate External Sales equal to Fifty Million U.S. Dollars ($50,000,000.00), Purchaser shall make, within thirty (30) days following the date on which PRAHS files its next quarterly report with the SEC after achievement, a cash payment of Five Million U.S. Dollars ($5,000,000.00) to Seller (or as otherwise directed by Seller's Representative) (the "Second Milestone Payment"); provided, however, that such achievement occurs prior to the third (3rd) anniversary of the Closing Date (the "Second Milestone Period");
>
> (vi) upon the achievement of aggregate External Sales equal to Seventy Five Million U.S. Dollars ($75,000,000.00), Purchaser shall make, within

thirty (30) days following the date on which PRAHS files its next quarterly report with the SEC after achievement, a cash payment of Seven Million Five Hundred Thousand U.S. Dollars ($7,500,000.00) to Seller (or as otherwise directed by Seller's Representative) (the "Third Milestone Payment"); provided, however, that such achievement occurs prior to the fourth (4th) anniversary of the Closing Date (the "Third Milestone Period"); and

(vii)    for four (4) consecutive calendar years following the achievement of aggregate External Sales equal to Seventy-Five Million U.S. Dollars ($75,000,000.00) (the "Major Milestone", and the date on which the Major Milestone is achieved, the "Major Milestone Date"), Purchaser shall make, within thirty (30) days following the date on which PRAHS files its next quarterly report with the SEC after each of the four (4) anniversaries of the Major Milestone Date, a per annum royalty payment to Seller (or as otherwise directed by Seller's Representative) equal to one percent (1%) of the aggregate amount of External Sales made during the applicable calendar year (such payments, the "Royalty Payments"). For the avoidance of doubt, any such Royalty Payments shall be made regardless of whether the First Milestone Payment, the Second Milestone Payment and/or the Third Milestone Payment have previously been made).

(*Id*. at p. 352; emphasis in original.) The APA provides that "External Sales" "means the sale of one or more licenses to the Solutions by [PRA] or one of its Affiliates to a third party which is not (i) an Affiliate of [PRA] or (ii) using such license(s) in connection with providing services to [PRA] and/or any of its Affiliates." (*Id*. at p. 374.)

12.    The APA further states that contingent payments provided for in the individual Development and Sales Milestones are "independent" obligations of PRA:

Independence of Contingent Payments. [PRA]'s obligation to pay the Contingent Payments to [Plaintiffs] (or as otherwise directed by [Plaintiffs'] Representative) in accordance with Section 2.6(a) is an independent obligation of [PRA] and is not otherwise conditioned or contingent upon the satisfaction of any conditions precedent to any preceding or subsequent Contingent Payment and the obligation to pay a Contingent Payment to [Plaintiffs] (or as otherwise directed by [Plaintiffs'] Representative) shall not obligate [PRA] to pay any preceding or subsequent Contingent Payment. For the avoidance of doubt and by way of example, if the conditions precedent to the payment of the First Milestone Payment for the First Milestone Period are not satisfied, but the conditions precedent to the payment of the Second Milestone Payment for the Second Milestone Period are satisfied, then [PRA] would be obligated to pay such Second Milestone Payment for the Second Milestone Period for which the corresponding conditions precedent have been satisfied, and not the First Milestone Payment for the First Milestone Period.

(*Id.* at pp. 352–53.)

13. Finally, the APA contained a merger clause that provides as follows:

Entire Agreement. This Agreement, including the Schedules and Exhibits hereto, constitutes the entire agreement of the parties with respect to the subject matter hereof and supersedes all prior discussions, negotiations, and understandings.

(*Id.* at p. 371.)

14. Plaintiffs have acknowledged that the contingent payments provided for in Article 2.6 of the APA were "never guaranteed" and were dependent on PRA achieving the Milestones. (Pls.' Mem. Supp. of Pls.' Mot. Dismiss Counterclaims, ECF No. 42, at p. 13.)[3]

---

[3] In their Mem. Supp. of Pls.' Mot. Dismiss Counterclaims, Plaintiffs state:

*C. Parthasarathy's Employment Agreement with PRA*

15.     In connection with the APA, PRA hired Parthasarathy as an employee.[4] On June 8, 2015, PRA executed an Employment Agreement with Parthasarathy, hiring him as a Vice President of Technology for PRA, Inc. ("Employment Agreement," ECF No. 8.3.) The Employment Agreement states that Parthasarathy will have the "status and responsibilities as determined from time to time by" PRA's "CEO or the CEO's designee" and that the CEO or designee "will determine" Parthasarathy's "specific duties . . . and the means and manner by which [he] will perform those duties." (*Id.* at p. 1) The Employment Agreement does not expressly assign Parthasarathy any specific job duties associated with achievement of the Milestones.

16.     The Employment Agreement also provides that Parthasarathy will use his "best efforts . . . and [ ] devote [his] full time, skill, attention, and energies to [PRA's] business," and that he will not engage in "business activity which is

---

The Milestones are, however, by their very nature, contingent and achievement of the Milestones was never guaranteed. *See* ECF No. 37, Ex. A at § 2.6(a)(i)-(vii). Indeed, that is why the Milestones provide that Plaintiffs would be entitled to additional, contingent consideration upon the [ ] Solutions' achievement of various requirements. *Id.* Nothing in the APA states that achievement of the Milestones was guaranteed. Indeed, a cursory reading of the APA makes clear that the Milestones in Section 2.6 were not guaranteed because the APA states Plaintiffs would receive additional payments "provided, however, that the completion occurs within the Integration Period.

(*Id.*)

[4] PRA also hired approximately twelve (12) programmers employed by VHS who work in India.

competitive with [PRA's] business" or "which may (i) interfere with [his] ability to discharge [his] responsibilities" or "(ii) detract from [PRA's] business or its goodwill and reputation." (*Id.*) The Employment Agreement further provides that Parthasarathy may not:

> (i) work on either a part-time or independent contracting basis for any other company, business or enterprise without the prior written consent of the CEO; or
>
> (ii) serve on the board of directors or comparable governing body of any other material business, civic or community corporation or similar entity without the prior written consent of the CEO."

(*Id.*)

### D. The Development Milestones

17. The undisputed evidence in the record shows that neither Plaintiffs nor PRA fully appreciated the difficulty of integrating CTMax into PRA's clinical trial management environment, and the optimistic schedule for implementation of the new system envisioned by the parties quickly proved unattainable.

18. The attempt to integrate and implement CTMax into PRA proceeded in fits and starts. In June 2015, Parthasarathy advised PRA that he believed his team would be able to complete the deployment of the new CTMS at PRA within four to six months, but they ultimately failed to do so. (ECF Nos. 111/113, at p. 5.) PRA then set a series of new deadlines for completing the enhancements to CTMax and implementing the integration of the software into PRA, but each of the deadlines proved unachievable. (*Id.* at pp. 5–11.)

19.     PRA subsequently changed the name of the new CTMS software it was trying to implement to "Predictivv Study Operations" ("PSO").  PRA also decided to "unmanage" the CTMax software package and to implement only certain functionalities of CTMax into PRA's clinical trial management environment rather than trying to implement CTMax as a "managed" package.  (*Id*.; Plfs.' Br. Resp. to PRA's Mot. For SJ, ECF Nos. 125 [SEALED] and 133 [Public], at pp. 12–13.)

20.     Over time, Shannon placed increasing importance and urgency on completing the enhancements to PSO and implementing it within PRA.  (ECF Nos. 111/113, at pp. 6–10; ECF Nos. 125/133, at pp. 11–12.)  On August 2, 2016, PRA circulated a directive from Shannon, advising that he expected increased urgency and progress with developing PSO.  The directive instructed the PSO project team to promptly proceed with the implementation of PSO 3.0.  (ECF Nos. 111/113, at pp. 6–10.)

21.     During the second half of 2016 and into 2017, PRA provided additional resources and personnel towards completing the implementation of PSO into PRA. In June 2016, PRA hired Deborah Jones-Hertzog ("Jones-Hertzog") as the Senior VP of IT and tasked her with pushing the PSO project to completion as soon as possible. (*Id*.)  PRA also restructured Parthasarathy's role within PRA, removing his more direct responsibilities for implementing PSO, and instead tasking him to consult with the PSO project team and assist with preparing responses to customer Requests for Proposals (RFP).  (*Id*.)

22.     It is undisputed that despite the efforts of Plaintiffs and PRA, the Development Milestones were not achieved within the 18-month Integration Period

as required by the APA. PRA was not able to fully implement PSO in its clinical trial management environment until April 2018. (ECF Nos. 125/133, at p. 16.)

*E. Sales Milestones*

23.     Over the course of Parthasarathy's employment, he and PRA discussed and evaluated various potential avenues for selling CTMax, and later PSO, to companies in the biotech and pharmaceutical industries. (ECF Nos. 111/113, at pp. 11–12.) However, PRA was unwilling to sell PSO before PRA had successfully implemented it within its own clinical trial management environment. (ECF Nos. 125/133, at pp. 6–7.) Although Parthasarathy disagreed, he agreed that PRA would "need to have confidence in the software it is selling to customers," and that, if PRA lacked such confidence, "that would be a legitimate business reason not to sell CTMax." (ECF No. 112.1, at pp. 74–75.)

*F. The Takeda Master Service Agreement*

██████ Effective August 31, 2016, PRA entered into a Master Services Agreement to provide services to Takeda Pharmaceuticals ("Takeda MSA"). (ECF No. 113.1 [SEALED]; ECF No. 116.5, Ex. D [SEALED].) ██████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████



██████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

████████████████████████████

## G. Discussions of Amendments to the Milestones

28.     In December 2016, at Parthasarathy's request, he and Shannon met to discuss amending the APA to provide for new deadlines for achieving the Milestones. Shannon subsequently asked Jones-Hertzog to work with PRA's in-house counsel, Chuck Munn ("Munn"), to develop an amended framework for the Milestones. Jones-Hertzog and Irene worked on proposed terms of an amendment with Parthasarathy. However, while draft proposed terms of an amendment were circulated between Munn, Jones-Hertzog, and Irene, it is undisputed that they were never presented to Parthasarathy. (ECF Nos. 111/113, at pp. 10–11 and 12–13.)

29.     Plaintiffs allege that PRA "falsely promis[ed] to amend the APA and extend the milestone deadlines" and "made representations to Mr. Parthasarathy that induced him to believe that PRA intended to amend the payment milestone

timelines." (ECF No. 60.1, at ¶¶ 104–05, 109.)  More particularly, on February 8, 2017, Shannon sent an email to Parthasarathy stating that PRA was "obviously trying to get [VHS and/or Mr. Parthasarathy] a contract" to address the milestone timeline issue, and in or around May 2017, Jones-Hertzog communicated to Parthasarathy that she had proposed revised milestone timelines internally with PRA and was awaiting approval.  (ECF No. 60.1, at ¶¶ 116–17.)

30.    In July 2017, Parthasarathy sent his own proposal to PRA containing his suggestions regarding amendments of the Development Milestones and proposals for potential resolutions of the Sales Milestones.  (Dep. Ex. 161, ECF No. 112.1, at pp. 781–786.) In the proposal, Parthasarathy asserted: i) that Milestone One had been satisfied and "should be paid as soon as possible"; and ii) that Milestones Two and Three "need[ed] to be rewritten" or, alternatively, PRA needed to identify what additional work was needed from Parthasarathy so that those milestones could be completed and paid by no later than January 2018.  (*Id.*).

31.    In his proposal, Parthasarathy also acknowledged that the first Sales Milestone had not been achieved and proposed terms for a potential financial settlement between Plaintiffs and PRA.  (*Id.* at p. 785.) Parthasarathy proposed three options for settlement: that PRA pay VHS "7 million as a onetime payment . . . as a royalty to use the product"; that PRA pay VHS "2 million dollars . . . for four years"; or that PRA pay $2.5 million "immediate[ly]" and transfer the software back to Parthasarathy.  (*Id.* at p. 786.)

32.    Ultimately, PRA and Plaintiffs were not able to reach an agreement on amending the Milestones.

*H. My Game Solutions*

33. Sometime in late 2016, unbeknownst to PRA, Parthasarathy launched a mobile application for tennis players known as "My Game Solutions" ("MGS"). (PRA's Br. Opp. Pls.' Mot. For SJ, ECF Nos. 122 [SEALED] and 120 [Public], at pp. 1–4.) Initially, Parthasarathy began work on MGS from his home, however, sometime in August 2017, Parthasarathy opened an office space to conduct activities related to MGS and hired paid employees to assist him with his work for MGS. During late 2016 and 2017, Parthasarathy, who served as MGS's President and CEO, was involved in every aspect of the development of the application and the direction of MGS's employees. Parthasarathy also served on MGS's board of directors but did not inform PRA of his position on the MGS board. (*Id.*)

34. PRA claims that during 2017, Parthasarathy was "checked out of his [PRA] responsibilities and duties." (ECF No. 123, at p. 103; Dep. of Irene, at p. 116). Jones-Hertzog stated that sometime in 2017, Parthasarathy was disengaged from his job responsibilities, alleging that he would attend meetings without making any comments and not reply to e-mails. (ECF No. 112.1, Dep. of Jones-Hertzog, Ex.7, at p. 241.) Irene testified that Parthasarathy made a commitment "to dedicate his efforts to PRA and not start other businesses while employed by PRA; that was the commitment that he made," and that Parthasarathy's acceptance of compensation from PRA while forming MGS is the basis of PRA's breach of employment counterclaim. (Dep. of Irene, at p. 117, 119.)

*I. PRA Terminates Parthasarathy's Employment*

35.    In or around June 2017, PRA retained a consulting firm to review its progress in implementing PSO.  Shannon had becomes disenchanted with Parthasarathy and hoped to use the consultant's conclusions as a basis for terminating Parthasarathy's employment.  Shannon believed that terminating Parthasarathy would conclude PRA's obligations under the APA.  (ECF Nos. 125/133, at pp., at pp. 17–18.)

36.    In late October 2017, PRA terminated Parthasarathy's employment. The parties do not provide information regarding the reasons for Parthasarathy's termination.

37.    On February 9, 2018, PRA and Parthasarathy entered into a Confidential Release and Settlement Agreement, pursuant to which the parties agreed that Parthasarathy's employment ended effective December 29, 2017.

## II. PROCEDURAL BACKGROUND

38. Plaintiffs filed the Complaint in this matter on October 5, 2018. (ECF No. 5.) On November 15, 2018, this case was designated a mandatory complex business case and assigned to the undersigned. (Designation Order, ECF No. 1; Assignment Order, ECF No. 2.)

39. On November 1, 2019, the Court granted leave for Plaintiffs to file an Amended Complaint. (Or. on Pls.' Mot. to Am. Compl., ECF No. 74.) In the Amended Complaint, Plaintiffs allege claims against PRA for: breach of contract (First Cause of Action); intentional misrepresentation (Second Cause of Action); negligent misrepresentation (Third Cause of Action); fraudulent inducement (Fourth Cause of Action); violation of North Carolina's Unfair and Deceptive Trade Practices Act, N.C.G.S. § 75-1.1 ("UDTPA") (mislabeled as the Sixth Cause of Action); promissory estoppel (mislabeled as the Seventh Cause of Action); and unjust enrichment (mislabeled as the Eighth Cause of Action). (ECF No. 60.1, ¶¶ 129–195.)

40. On March 26, 2019, PRA filed its Amended Answer, Affirmative Defenses, and Counterclaims. ("Amended Counterclaims," ECF No. 37.) PRA brought counterclaims for: (1) breach of the APA against Parthasarathy and Value Health; (2) fraudulent inducement against Parthasarathy and Value Health; (3) negligent misrepresentation against Parthasarathy and Value Health; (4) breach of the Employment Agreement and Settlement Agreement against Parthasarathy; and (5) tortious interference with contractual relations against Parthasarathy. (*Id*.) Plaintiffs filed a Motion to Dismiss seeking dismissal of Defendants' counterclaims pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure. (ECF No.

41.) Following briefing and a hearing, the Court dismissed PRA's counterclaims for breach of the APA against Parthasarathy and Value Health, fraudulent inducement against Parthasarathy and Value Health, and negligent misrepresentation against Parthasarathy and Value Health. (ECF No. 61.) PRA subsequently filed a Voluntary Dismissal of its counterclaim for tortious interference with contractual relations against Parthasarathy. (ECF No. 86.) The sole counterclaim that remains is Count IV of the Amended Counterclaim for Breach of Contract Against Parthasarathy. (ECF No. 37, at p. 32.)

41. PRA filed a motion to dismiss seeking the dismissal of all of Plaintiffs' claims except for the breach of contract claim pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure ("Rules") (ECF No. 77.) Following briefing and a hearing, the Court issued an Order and Opinion granting the motion to dismiss to the extent it sought dismissal of Plaintiffs' claims for: intentional misrepresentation (fraud) and fraudulent inducement that were based on alleged pre-APA misrepresentations except for those fraud and fraudulent inducement claims based on alleged misrepresentations in the LOI; intentional misrepresentation (fraud) and fraudulent inducement based on alleged omissions from the LOI; negligent misrepresentation; promissory estoppel; and unjust enrichment. (ECF No. 106 at pp. 31–32.)

42. The four remaining claims in Plaintiffs' Amended Complaint are: Breach of Contract (Count I); Intentional Misrepresentation (Count II); Fraudulent Inducement (Count IV); and Violation of the North Carolina Unfair and Deceptive Trade Practices ("UDTPA"), N.C.G.S. § 75-1.1 (Count VI) (*Id.*) Defendants move for

Summary Judgment on each of these four claims. (ECF No. 110, at p. 2.) PRA filed its Brief in Support of Motion for Summary Judgment on June 12, 2020. (ECF No. 111.) Plaintiffs filed their Response to PRA's Motion for Summary Judgment on August 11, 2020. (ECF No. 125.) PRA filed a Reply in Support of Motion of Summary Judgment on September 10, 2020. (ECF No. 129.)

43. Plaintiffs move for summary judgment on: (1) PRA's sole-remaining counterclaim of breach of contract against Parthasarathy (ECF No. 116 at p. 1; ECF No. 37, at p. 22); and (2) the contention that ███████████████████ ███ under the APA. (ECF No. 116, at p. 2.) Plaintiffs filed an Opening Brief in Support of their Motion for Summary Judgment. (ECF No. 116.) PRA filed a Brief in Opposition to Plaintiffs' Motion for Summary Judgment (ECF No. 120), Plaintiffs filed their Reply in Support of their Motion for Summary Judgment. (ECF No. 128).

44. Plaintiffs and PRA also filed numerous sets of evidentiary materials in support of and in opposition to the Motions.

45. The Court held a hearing on the Motions for Summary Judgment at which counsel presented arguments. The Motions for Summary Judgment are now ripe for disposition

## III. ANALYSIS

### A. Standard of Review

46. "The purpose of summary judgment is to dispense with formal trials in cases where only legal issues remain 'by permitting penetration of an unfounded claim or defense in advance of trial and allowing summary disposition for either party when a fatal weakness in the claim or defense is exposed.'" *Miller v. Rose*, 138 N.C.

App. 582, 585–86 (2000) (citation omitted). "Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law.'" *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 523 (2012) (quoting N.C.G.S. § 1A-1, Rule 56(c)). The moving party bears the burden of presenting evidence which shows that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *Hensley v. Nat'l Freight Transp., Inc.*, 193 N.C. App. 561, 563 (2008). The moving party may meet this burden by "proving an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would be barred by an affirmative defense." *Variety Wholesalers, Inc.*, 365 N.C. at 523. An issue is "material" if "resolution of the issue is so essential that the party against whom it is resolved may not prevail." *McNair v. Boyette*, 282 N.C. 230, 235 (1972). "A 'genuine issue' is one that can be maintained by substantial evidence." *Dobson v. Harris*, 352 N.C. 77, 83 (2000).

47.     Once the movant presents evidence in support of the motion, the nonmovant "cannot rely on the allegations or denials set forth in her pleading [ ] and must, instead, forecast sufficient evidence to show the existence of a genuine issue of material fact in order to preclude an award of summary judgment." *Steele v. Bowden*, 238 N.C. App. 566, 577 (2014) (internal citation omitted). In conducting its analysis, the Court must view the evidence in the light most favorable to the nonmovant. *Dobson,* 352 N.C. at 83.

48.     In determining whether the non-movant has met its burden in opposing a motion for summary judgment, the judge "unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict[.]" *Sloan v. Miller Bldg. Corp.*, 119 N.C. App. 162, 165–66 (1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252–55 (1986)) (quotations and emphasis omitted).  As recently reiterated by the North Carolina Court of Appeals, the burden on the non-movant goes beyond merely producing some evidence, or a scintilla of evidence, in support of its claims.  Rather,

> [i]f the movant meets [its] burden, the nonmovant must take affirmative steps to set forth specific facts showing the existence of a genuine issue of material fact. . . . A genuine issue of material fact is one that can be maintained by substantial evidence.  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and means more than a scintilla or a permissible inference.

*Khashman v. Khashman*, 255 N.C. App. 449 (Sept. 5, 2017) (unpublished) (citations and quotation marks omitted).  In summary, this Court must decide "not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." *Anderson*, 477 U.S. at 251.

49.     The Court will first address PRA's Motion and then Plaintiffs' Motion.

**B. PRA's Motion**

50.     Defendants move for summary judgment on the four remaining claims in Plaintiffs' Amended Complaint: breach of the APA (Count I); intentional misrepresentation (Count II); fraudulent inducement (Count IV); and violation of the

North Carolina Unfair and Deceptive Trade Practices ("UDTPA"), N.C.G.S. § 75-1.1 (Count VI).

1. Breach of the APA

51. Plaintiffs allege that PRA breached the express and implied terms of the APA by failing to make the contingent payments to Plaintiffs for meeting the Milestones. (ECF No. 60.1, at ¶¶ 129–33; ECF No. 125/133, at pp. 20–24.)

52. Preliminarily, the Court notes that the APA provides that Delaware law shall apply to construction and enforcement of the agreement, and that Plaintiffs and PRA argue that Delaware law is applicable to the claims for breach of the APA. "As a general rule, North Carolina will give effect to a contractual provision agreeing to a different jurisdiction's substantive law." *Tanglewood Land Co. v. Byrd*, 299 N.C. 260, 262 (1980) ("[W]here parties to a contract have agreed that a given jurisdiction's substantive law shall govern the interpretation of the contract, such a contractual provision will be given effect."); *Akzo Nobel Coatings Inc. v. Rogers*, 2011 NCBC LEXIS 42, at *21 (N.C. Super. Ct. Nov. 3, 2011). However, North Carolina courts will not apply the chosen state's law if "(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of [North Carolina]." *Cable Tel Servs. v. Overland Contracting, Inc.*, 154 N.C. App. 639 (2002) (applying North Carolina law to a contract dispute despite a Colorado choice of law provision because there was no substantial relationship between the parties or transaction to Colorado).

53. The Court concludes that Delaware law should be applied to the claim for breach of the APA. First, PRA is a Delaware corporation which provides the necessary substantial relationship between Delaware and the parties. (ECF No. 8.1 at APA, p. 1.) *Akzo Nobel Coatings, Inc. v. Rogers*, 2011 NCBC LEXIS 42, at *22 (N.C. Super. Ct. Nov. 3, 2011) (finding "Delaware has a substantial relationship to the transaction" where defendants' contracts containing the Delaware choice of law provision were with plaintiff, a Delaware corporation). Second, the Court has reviewed the applicable law and concludes that applying Delaware law to the claim for breach of the APA would not be contrary to any fundamental policy of North Carolina.

54. Defendants seek summary judgment as to Plaintiffs' claims that PRA breached the APA by failing to make the contingent payments tied to the Milestones. Under Delaware law, the elements of a breach of contract claim are: the existence of a contract, the breach of an obligation imposed by that contract, and resulting damages to the plaintiff. *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003). It is undisputed that the APA is a valid contract.

55. The Delaware Supreme Court has held

> Delaware adheres to the objective theory of contracts, i.e. a contract's construction should be that which would be understood by an objective, reasonable third party. We read a contract as a whole and [ ] will give each provision and term effect, so as not to render any part of the contract mere surplusage.
>
> When the contract is clear and unambiguous, we will give effect to the plain meaning of the contract's terms and provisions. On the contrary, when we may reasonably ascribe multiple and different interpretations to a contract,

we will find that the contract is ambiguous. An unreasonable interpretation produces an absurd result or one that no reasonable person would have accepted when entering the contract.

*Estate of Osborn v. Kemp,* 991 A.2d 1153, 1159–60 (Del. 2010) (internal citations and quotations omitted). "The determination of ambiguity lies within the sole province of the court." *Id*. at 1160.

56. The Delaware Supreme Court has "upheld awards of summary judgment in contract disputes where the language at issue is clear and unambiguous. In such cases, the parol evidence rule bars the admission of evidence from outside the contract's four corners to vary or contradict that unambiguous language." *GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 783 (Del. 2012) (internal citations omitted). "But, where reasonable minds could differ as to the contract's meaning, a factual dispute results and the fact-finder must consider admissible extrinsic evidence. In those cases, summary judgment is improper." *Id*. The parties do not contend that the language in the Development Milestones provisions of the APA is ambiguous or need interpretation.

### a. Development Milestones

57. Significantly, Plaintiffs do not claim, and have not presented evidence, that they fully achieved the Development Milestones as expressly set out in Schedules 2.6(a)(i–iii) of the APA. Instead, Plaintiffs argue that PRA breached the APA because: (a) PRA did not reasonably and in good faith determine the completion of the Development Milestones in 2.6(a)(i) and 2.6(a)(ii); (b) PRA waived the Development Milestones 2.6(a)(i) and 2.6(a)(ii); (c) VHS substantially performed the

Development Milestones in sections 2.6(a)(i) and 2.6(a)(ii); and (d) PRA improperly conditioned Development Milestone 2.6(a)(iii) on achievement of the Development Milestones in sections 2.6(a)(i) and 2.6(a)(ii). (ECF Nos. 125/133, at pp. 20–29.) PRA challenges these contentions. (ECF No. 110, at pp. 3–4; ECF Nos. 113/111, at pp. 114–19; ECF No. 129, at pp. 1–8.) The Court takes each argument in turn.

58. Plaintiffs first argue that the failure to meet the Development Milestones should be excused because PRA failed to exercise its discretion in determining whether VHS had achieved those milestones reasonably and in good faith, and that its "decision making was arbitrary and improperly motivated." (ECF Nos. 125/133, at pp. 20, 21–22.) Plaintiffs contend that: "PRA knew the 'modules' and 'functions' . . . had been in a constant state of flux"; "PRA applied different technical definitions of completion from those agreed to, knowingly disregarded substantial changes to the Salesforce® modules to be integrated, and failed to consider that the software functions PRA required were 'mostly code complete'"; and "PRA directly and indirectly prevented the completion of the requirements." (*Id.* at pp. 20–21.) Plaintiffs also claim that PRA "failed to credit completion of new and different [development] requirements." (*Id.* at p. 22.)

59. In addition, Plaintiffs claim that in 2017, after the deadlines for completing the Development Milestones had passed, PRA engaged in conduct demonstrating "bad faith." (*Id.* at pp. 21–22.) Plaintiffs allege that in late 2016, PRA was "focused on extracting product knowledge" from Mr. Parthasarathy, as opposed to reasonably assessing completion. (*Id.* at p. 21.) By 2017, PRA was "actively deceiving Mr. Parthasarathy about amending the APA and was determined to

terminate his employment, mistakenly believing it would end PRA's obligations under the APA." (*Id*. at pp. 21–22.)

60. Plaintiffs' argument amounts to a claim that PRA breached an implied duty of good faith and fair dealing under the APA.[5] Delaware will imply a covenant of good faith and fair dealing to "honor the parties' reasonable expectations" under the contract. *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 447 (Del. 2005). However, Delaware courts "will only imply contract terms when the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected." *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010). The "implied covenant is a judicial convention designed to protect the spirit of an agreement when, without violating an express term of an agreement, one side uses oppressive or underhanded tactics . . . ." *Chamison v. Healthtrust, Inc.*, 735 A.2d 912, 920 (Del. Ch. 1999), *aff'd*, 748 A.2d 407 (Del. 2000); *see LSVC Holdings, LLC v. Vestcom Parent Holdings, Inc.*, 2017 Del. Ch. LEXIS 865, *31 (2017).

61. The covenant of good faith "is not an equitable remedy for rebalancing economic interests after events that could have been anticipated, but were not, [ ] later adversely affected one party to a contract. Rather the covenant is a limited and extraordinary legal remedy." *Nemec*, 991 A.2d at 1128. The covenant will not be implied "to give plaintiffs contractual protections that they failed to secure for

---

[5] Indeed, the case authority cited by Plaintiffs in support of their argument, *Gilbert v. El Paso Co.*, 490 A.2d 1050 (Del.Ch. 1984), analyzed the issue as one falling under the implied covenant of good faith and fair dealing. *Id*. at 1054–55.

themselves at the bargaining table." *Winshall v. Viacom Int'l, Inc.*, 55 A.3d 629, 636-37 (Del. Ch. 2011). A court should not use the implied covenant to "rewrite a contract" that a party "now believes to have been a bad deal." *Nemec*, 991 A.2d at 1126. "Parties have a right to enter into good and bad contracts, the law enforces both." *Id.*

62. Once the Court determines that a "party has acted arbitrarily or unreasonably," *Id.,* the task faced by a court in applying the covenant of good faith and fair dealing as follows:

> [T]he first step in evaluating an implied covenant claim is to determine whether the contract in fact contains a gap that must be filled. That is because the implied covenant applies only if the contract is silent as to the subject at issue. If the contract directly addresses the matter at hand, existing contract terms control . . . such that implied good faith cannot be used to circumvent the parties' bargain. If, on the other hand, the express terms of the contract do not address the subject at issue, the Court must then consider whether implied contractual terms fill the gap. The Court conducts that inquiry by asking whether it is clear from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of as a breach of the implied covenant of good faith—had they thought to negotiate with respect to that matter. The Court does not derive implied obligations from its own notions of justice or fairness. Instead, it asks what the parties themselves would have agreed to had they considered the issue in their original bargaining positions at the time of contracting. The implied covenant therefore operates only in that narrow band of cases where the contract as a whole speaks sufficiently to suggest an obligation and point to a result, but does not speak directly enough to provide an explicit answer.

*MHS Capital LLC v. Goggin*, 2018 Del. Ch. LEXIS 151, *30–32 (May 10, 2018) (quotations and citations omitted).

63.     The Court notes that despite invoking the covenant of good faith and fair dealing, Plaintiffs do not argue how the standards established by Delaware courts apply to the facts in this case.  For example, Plaintiffs do not identify any "gaps" in the provisions of the APA that need to be filled, nor argue what terms the parties "would have agreed to had they considered the issue in their original bargaining positions at the time of contracting."  *MHS Capital LLC*, 2018 Del. Ch. LEXIS 151 at *31 (citing *Katz v. Oak Industries, Inc.,* 508 A.2d 873, 880 (Del. 1986)).  Instead, Plaintiffs take issue with various decisions made by PRA and complain that, in retrospect, they seem unfair or arbitrary.

64.     It is not clear in what way Plaintiffs contend PRA failed to reasonably exercise its discretion in determining that the first Development Milestone as outlined in Schedule 2.6(a)(i) had not been achieved.  The first Development Milestone required that CTMax be integrated into PRA's Salesforce environment within 18 months following the closing.  While the evidence may show that pieces of CTMax functionality were integrated into PRA within the 18-month period, it is undisputed that full integration did not occur until approximately April 2018, almost three years after the Closing.  Plaintiffs have not created a disputed issue of fact that PRA did not act reasonably and in good faith in determining that Plaintiffs failed to meet the first Development Milestone.

65.     Plaintiffs also contend that PRA acted unreasonably because it did not consider that individual "key product enhancements" listed in the Second Milestone (Schedule 2.6(a)(ii)) had been completed and that certain other enhancements were eliminated by PRA as unnecessary.  The evidence shows that some individual product

enhancements listed in Schedule 2.6(a)(ii) were completed before Parthasarathy's employment with PRA terminated, and that some of those enhancements were accomplished within the required 18-month period following the Closing. The evidence also shows that in implementing CTMax into PRA, PRA determined that at least some of the product enhancements in Schedule 2.6(a)(ii) were not needed.

66.     The evidence, however, does not support Plaintiffs' contention that the completion of some product enhancements and the elimination of others impeded Plaintiffs' achievement of the Second Milestone or that PRA unreasonably failed to consider those facts in determining that Plaintiffs had not completed the second Development Milestone.

67.     Finally, Plaintiffs contend that after the deadlines for completing the Development Milestones had passed, PRA engaged in conduct demonstrating that its determinations as to the first and second Development Milestones were made in "bad faith." (ECF Nos. 125/133, at p. 21.) Plaintiffs claim that in late 2016 "PRA was 'focused on extracting product knowledge' from Mr. Parthasarathy, as opposed to reasonably assessing completion." (*Id*.) Plaintiffs also contend that "[b]y 2017, PRA was actively deceiving [ ] Parthasarathy about amending the APA and was determined to terminate his employment, mistakenly believing it would end PRA's obligations under the APA." (*Id*. at pp. 21–22.)

68.     Plaintiffs' contention that PRA was "focused on extracting product knowledge" is reference to a phrase contained in an email from Irene to Jones-Hertzog sent in December 2016 discussing Irene's review of the Milestones and his suggested revisions for purposes of negotiating amendments to the Milestones with

Parthasarathy. (ECF No. 125.15.) The full sentence from Irene's email provides as follows: "Here are some thoughts – focused on extracting product knowledge (IP) and relating to PRA's environment for *purposes of expedited implementation*." (*Id.* (emphasis added).) Rather than suggesting bad faith, the email indicates Irene's desire to acquire knowledge about the Solutions from Parthasarathy in order to incorporate them into PRA as quickly as possible.

69. The evidence supports Plaintiffs' contention that in or about June or July 2017, Shannon concluded that he wanted to terminate Parthasarathy's employment with PRA and believed that it would end PRA's obligations under the APA. The evidence also shows that PRA stopped communicating with Parthasarathy about amending the Milestones in late July 2017 but did not inform him that PRA would not further negotiate over the amendments.[6] However, after careful consideration, the Court concludes this evidence does not raise an issue of disputed fact that PRA did not act reasonably and in good faith in determining that Plaintiffs failed to meet the first and second Development Milestones. Even if the conduct involved suggests a lack of good faith by PRA in handling Parthasarathy's termination, it occurred well after the deadline for completing the first and second Development Milestones as provided in the APA, and there is no evidence linking Shannon's decision regarding Parthasarathy's termination with PRA's determinations that the Development Milestones had not been achieved.

---

[6] As discussed below in relation to Plaintiffs' claims for fraud, the Court has concluded that PRA did not make affirmative misrepresentations to Plaintiffs regarding PRA's intent to amend the Milestones.

70. In summary, Plaintiffs' evidence fails to raise an issue of fact as to PRA's reasonable exercise of its discretion in determining that Plaintiffs had not achieved the first and second Development Milestones.

71. Plaintiffs next argue that PRA waived the deadlines for completing the Development Milestones. (ECF Nos. 125/133, at p. 21.) Under Delaware law

> [i]t is well settled . . . that a party may waive contractual requirements or conditions. But, the standards for demonstrating waiver -- the voluntary and intentional relinquishment of a known right -- are quite exacting. The doctrine implies knowledge of all material facts and an intent to waive, together with a willingness to refrain from enforcing those [ ] rights. Furthermore, the facts relied upon to demonstrate waiver must be unequivocal. Applying those principles, [Delaware courts] have held that three elements must be demonstrated to invoke the waiver doctrine: (1) that there is a requirement or condition capable of being waived, (2) that the waiving party knows of that requirement or condition, and (3) that the waiving party intends to waive that requirement or condition.

*Amirsaleh v. Bd. of Trade of N.Y.*, 27 A.3d 522, 529–30 (Del. 2011) (quotations and citations omitted).

72. PRA argues that the APA requires that any waiver of its terms must be in writing. (ECF No. 112.1, at p. 370, "No waiver by a party of any term, covenant, representation or warranty contained herein shall be effective unless in writing.") PRA contends that the written documents relied on by Plaintiffs in support of their waiver argument were internal communications between PRA officials regarding the amendment negotiations after the Development Milestone deadlines had passed and that the communications were never shared with Plaintiffs. (ECF Nos. 113/111, at pp. 16–17.) PRA further argues that Plaintiffs have failed to create an issue of fact

as to whether PRA intentionally and voluntarily waived the Development Milestones. (ECF No. 129, at p. 2.)

73.   The Court has painstakingly reviewed the evidence cited by Plaintiffs in support of their argument that PRA waived the deadlines for the Development Milestones. First, the undisputed evidence shows that the written documents relied upon by Plaintiffs were never shared with Plaintiffs and, therefore, cannot form the basis for a claim of waiver. Second, the evidence simply does not raise a genuine issue of fact that PRA intended to waive the Development Milestones. At best, the evidence establishes that PRA engaged in various communications with Parthasarathy about the possibility of amending the deadlines but fails to support even an inference that PRA "unequivocal[ly]" waived any Milestones. *Amirsaleh*, 27 A.3d at 529.

74.   Plaintiffs next contend that they have raised an issue of fact as to whether PRA breached the APA because "there is adequate evidence of 'substantial performance' of the first two [D]evelopment [M]ilestone requirements," and cite in support *Gildor v. Optical Sols., Inc.*, 2006 Del. Ch. LEXIS 110, at *25 (Del. Ch. June 5, 2006). (ECF No. 125/133, at p. 21.) Plaintiffs argue that there is evidence that some of the functionality required under sections 2.6(a)(i) and (ii) of the APA were achieved. (*Id.*)

75.   PRA contends that the theory of "substantial performance" is not available to cure Plaintiffs' failure to perform under the facts at issue. (ECF No. 129, at p. 2.) Instead, PRA argues that *Gildor* and its progeny have applied the theory of "substantial performance" to forgive a party's failure to meet the express

requirements of a contract only when the question is whether a party has adequately complied with notice provisions contained in an agreement, citing *Vintage Rodeo Parent, LLC v. Rent-a-Ctr., Inc.*, 2019 Del. Ch. LEXIS 87, *43–44 (Del. Ch. Mar. 14, 2019) ("[T]his Court has, at times, accepted substantial compliance with notice provisions in lieu of literal compliance, when the circumstances so justified.").

76.     The Court agrees with PRA's argument. The only reported Delaware decisions that the Court has located have applied the substantial performance theory only in the narrow circumstances dealing with notice requirements in contracts. *See e.g.*, *Arneault v. Diamondhead Casino Corp.*, C.A. No. 16-989-LPS, 2019 U.S. Dist. LEXIS 93108, *8-9, (D. Del. 2019). The Court concludes that the substantial performance theory does not apply to Plaintiffs' failure to meet the express requirements of the Development Milestones in the APA.

77.     Plaintiffs also contend that PRA breached section 2.6(b) of the APA by improperly conditioning the achievement of the Development Milestone in 2.6(a)(iii) and Sales Milestones "on PRA's internal development of PSO." (ECF Nos. 125/133, at pp. 22–24.) Plaintiffs' argument, however, is difficult to discern. Although section 2.6(b) unambiguously provides that PRA cannot make the *payment* for achievement of any Milestone conditional on having completed a prior Milestone, Plaintiffs contend that the provision also "bar[s] PRA from conditioning or sequencing the completion of the [M]ilestones (or requirements within a [M]ilestone)." (*Id*. at p. 23.) Plaintiffs do not cite to any evidence in the record in their argument to support this claim (*see id*. at pp. 22–23), and it is not at all clear to the Court in what way Plaintiffs contend PRA violated section 2.6(b).

78. PRA argues that section 2.6(b) only prohibits PRA from conditioning the payments for achievement of a particular Milestone on having achieved a prior Milestone, and that "[t]here is no evidence that . . . any of the milestones were achieved. Thus, PRA did not have an obligation to pay any of the milestones, nor did it improperly 'condition' payment of one milestone 'upon the satisfaction of any conditions precedent to' another milestone." (ECF Nos. 113/111, at p. 15.)

79. The Court has thoroughly considered Plaintiffs' argument and concludes that the terms of section 2.6(b) are unambiguous, and that Plaintiffs have failed to create any issue of material fact that PRA breached section 2.6(b) of the APA.

**b. Sales Milestones**

80. Plaintiffs next argue that PRA "interfered" with achievement of the Sales Milestones in breach of the implied covenant of good faith and fair dealing. (ECF No. 125/133, at pp. 25–29.) Plaintiffs claim that there is

> substantial evidence that PRA used 'oppressive or underhanded tactics' that 'thwarted' [Plaintiffs'] reasonable expectations and a 'fair opportunity to maximize' the External Sales Earnout, such as by intending ███████████████████████ ███████, preventing marketing of the Solutions and rejecting specific customer opportunities, limiting and eliminating qualifying license arrangements, exploiting the Solutions for Takeda MSA to earn service revenue for PRA but refusing to give VHS milestone credit, diverting resources and changing operational priorities, and repeatedly rejecting all External Sales proposals years before the milestone period ended, limiting Mr. Parthasarathy's role and ultimately terminating his employment to try to escape the APA earnout obligations.

(*Id*. at pp. 28–29; quotations omitted.) Plaintiffs, however, do not cite to specific record evidence or discuss the evidence supporting these claims in this portion of their

argument in their brief (*Id.* at pp. 25–29), and it is not clear to the Court upon what evidence Plaintiffs base some of these alleged actions by PRA.

81.     In order to decide if the covenant of good faith and fair dealing should be applied, the Court must decide whether PRA "has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that [Plaintiffs] reasonably expected," *Nemec*, 991 A.2d at 1126, and if so, "determine whether the contract in fact contains a gap that must be filled." *MHS Capital LLC*, 2018 Del. Ch. LEXIS 151 at *30–32. "[T]he implied covenant applies only if the contract is silent as to the subject at issue . . . [i]f, on the other hand, the express terms of the contract do not address the subject at issue, the Court must then consider whether implied contractual terms fill the gap." *Id.* However, the existence of "gap" does not automatically require application of the implied covenant. Instead, the Court must decide if the missing term is one that the parties did not, and could not have, anticipated in negotiating the APA. "The implied covenant of good faith and fair dealing involves a 'cautious enterprise,' inferring contractual terms to handle developments or contractual gaps that the asserting party pleads neither party anticipated," *Nemec*, 991 A.2d at 1125, and is not a means for creating "contractual protections that 'they failed to secure for themselves at the bargaining table." *Winshall*, 76 A.3d at 816 (internal quotation omitted); *see also Allied Capital Corp. v. GC-Sun Holdings, L.P.,* 910 A.2d 1020, 1035 (Del. Ch. 2006) ("[C]ourts should be most chary about implying a contractual protection when the contract easily could have been drafted to expressly provide for it."). Only if the missing term is one the parties could not have anticipated will the Court provide an implied term.

82. Plaintiffs do not specifically identify the "gaps" in the APA that the implied covenant must fill. Further, Plaintiffs do not address whether the parties negotiated about or considered the missing term and, if not, why the parties could not have anticipated the issue involved in the missing term. Plaintiffs also do not explain "what the parties themselves would have agreed to had they considered the issue in their original bargaining positions at the time of contracting." *MHS Capital LLC*, 2018 Del. Ch. LEXIS 151, at \*30–32. Instead, they contend only that PRA's actions were arbitrary or unfair.

83. Plaintiffs first contend that PRA interfered with the achievement of the Sales Milestones because it acquired Plaintiffs' ███████████████████████ ███████████████████ (ECF Nos. 125/133, at p. 28.) Plaintiffs do not explain how PRA's motivations for entering into the APA with Plaintiffs could be characterized as a breach of covenant of good faith in performing under the APA. Nevertheless, the Court has thoroughly reviewed the evidence presented by Plaintiffs and concludes that, at worst, it suggests that one of the reasons PRA believed it would be advantageous to acquire the Solutions was because PRA believed it was promising technology and wanted to purchase it to prevent its competitors from acquiring the technology. In other words, PRA appears to have had a legitimate business interest in acquiring PRA's technology.

84. In addition, there is no contractual gap regarding this issue. To the contrary, in the preamble paragraphs in the APA, the parties expressly acknowledge Plaintiffs' "desire" to sell to PRA, and PRA's desire to purchase, "the Solutions and substantially all of the assets of [Plaintiffs]" related to Plaintiffs' business of

"provid[ing] cloud based solutions for the clinical trial process." (ECF No. 112.1, at p. 349.) The implied covenant of good faith is not applicable to this issue.

85.     Plaintiffs next argue that PRA violated a duty of good faith and fair dealing by "preventing marketing of the Solutions and rejecting specific customer opportunities, [and] limiting and eliminating qualifying license arrangements." (*Id*.) While Plaintiffs presented evidence that PRA refused to let Parthasarathy attempt to sell CTMax/PSO to two potential customers (ECF Nos. 125/133, at pp. 6–7, 10–11, and 16), PRA counters with evidence that it prevented Plaintiffs from selling the Solutions because it had not yet implemented PSO within PRA and lacked confidence that it could support the software until it was using it itself and was not yet prepared to expend the extensive resources necessary to sell and support PSO to third-party customers. (ECF No. 129, at pp. 3, 5–7.) Parthasarathy conceded that PRA's lack of confidence in PSO was a legitimate reason not to begin selling it to PRA's customers. (ECF No. 112.1, at pp. 74–75.)

86.     Again, after careful review of the evidence in the record, the Court concludes that no reasonable fact finder could conclude that PRA prevented sales of PSO to specific customers to impede Plaintiffs from achieving External Sales, and Plaintiffs' argument is not supported.

87.     Plaintiffs contend that PRA breached an implied duty of good faith by ███████████████████████████████████████████████████████████ ███████████████████████████." (ECF Nos. 125/133, at p. 28.) Plaintiffs argue that the ███████████████████████████████ in ████████████████ ███████████████████████████████████████████████████████████

▮▮▮▮▮▮▮ should be credited to Plaintiffs as an "External Sale" of the Solutions under APA. (ECF Nos. 116/117.1, at pp. 13–16.) [7] Plaintiffs contend that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ violates an implied duty of good faith and fair dealing. Plaintiffs do not expressly address how the current definition of "External Sale" has a gap, or whether they did, or should have, anticipated the need to further clarify the definition of "External Sale" in negotiating the APA.

88.     In this instance, however, it is not significant because the Court has thoroughly considered the record and concludes that there is insufficient evidence to create an issue of fact that PRA acted unreasonably or arbitrarily in failing to credit ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. To the contrary, Plaintiffs did not contend that the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" until after this lawsuit was filed, and first raised the claim in the Amended Complaint. As discussed below, Plaintiffs and PRA have offered differing interpretations of the scope of the term "External Sales." Accordingly, the Court concludes that there is no issue of fact and, as a matter of law, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

89.     Plaintiffs also argue that PRA breached a covenant of good faith and fair dealing by "diverting resources and changing operational priorities" and "limiting Mr. Parthasarathy's role and ultimately terminating his employment," thereby

---

[7] Plaintiffs' contention that the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ for purposes of achieving the Sales Milestones is an issue raised in Plaintiffs' Motion and is considered below in conjunction with decision of that motion.

interfering with achievement of the Sale Milestones. (ECF Nos. 125/133, at pp. 28–29.) PRA contends that, to the extent Plaintiffs now complain that PRA did not give Parthasarathy sufficient control over, and did not devote sufficient resources to, achieving the Milestones, Plaintiffs "could have insisted on specific contractual commitments from PRA about the issues . . . , including the level of resources devoted to developing CTMax, a guarantee that Parthasarathy would have 'full authority' over the development, or a plan for making external sales." (ECF Nos. 113/111, at p. 17 (citing *Airborne Health, Inc. v. Squid Soap, LP,* 984 A.2d 126, 145–47 (Del Ch. Nov. 23, 2009) ("These provisions are familiar to any transactional lawyer, and [VHS] was a sophisticated party represented by able counsel.")).) PRA argues that "'[t]he implied covenant of good faith and fair dealing cannot properly be applied to give the Plaintiffs contractual protections that 'they failed to secure for themselves at the bargaining table,'" quoting *Winshall*, 76 A.3d at 816. Finally, Defendants argue that the evidence does not support a claim that PRA intentionally attempted to deprive Plaintiffs of the ability to achieve the Milestones. (ECF Nos. 113/111, at pp. 18–19.)

90. Again, the Court finds that Plaintiffs could and should have bargained for terms requiring PRA to provide certain levels of resources and for Parthasarathy's control over achievement of the Sales Milestones. In a case in which the defendant argued the plaintiff breached a duty of good faith by failing to devote sufficient resources to meeting incentive sales objectives, the Delaware Chancery Court held:

> [Defendant]'s position is also undercut by the ease with which [Defendant] could have insisted on specific contractual commitments from [Plaintiff] regarding the expenditure of resources, or some form of "efforts" obligation for [Plaintiff]. These provisions are familiar to

any transactional lawyer, and [Defendant] was a sophisticated party represented by able counsel. Moreover, Section 7.6, entitled "Obligations of Seller," provides that "[e]ach Selling Partner agrees to take all reasonable actions necessary to cause Seller to perform its obligations hereunder and to otherwise comply with the terms of this Agreement." [Defendant] could have insisted on a provision binding [Plaintiff]. Rather than holding out for these types of contractual protections, [Defendant] accepted earn-out provisions that are expressly phrased in conditional terms.

*Airborne Health, Inc.*, 984 A.2d at 147. The implied covenant should not be applied here to create obligations on PRA that Plaintiffs should have obtained at the bargaining table.

91. The same holds true for Plaintiffs' claim that PRA terminated Parthasarathy to interfere with his ability to achieve the Sales Milestones. Parthasarathy, with assistance of counsel, negotiated a comprehensive Employment Agreement in which he agreed to accept at-will employment with PRA. There is no reason that Parthasarathy should not have anticipated the need to negotiate appropriate protections for himself against PRA terminating his employment before he had an opportunity to achieve the Milestones. He did not do so, and this Court cannot now provide him this protection under the guise of implying a duty of good faith.

92. In sum, the Court finds that Plaintiffs have failed to establish that PRA's so-called "interference" with, and failure to devote sufficient resources to, achievement of the Sales Milestones involved issues that Plaintiffs could not have anticipated in negotiating the APA and Employment Agreement.

93. Finally, the Court again has exhaustively studied the evidence in the record and concludes that Plaintiffs simply do not raise a genuine issue of material fact regarding whether PRA used underhanded or oppressive tactics to prevent Plaintiffs from achieving the Sales Milestones. In deciding whether Plaintiffs have met their burden in opposing PRA's Motion, this Court must decide "not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." *Anderson*, 477 U.S. at 251. Plaintiffs' evidence is not sufficient for a reasonable factfinder to conclude that PRA unlawfully interfered with achievement of the Sales Milestones.

94. Therefore, to the extent PRA seeks summary judgment on Plaintiffs' claims for breach of the APA, PRA's Motion should be GRANTED.

2. Intentional Misrepresentation and Fraudulent Inducement

95. Plaintiffs bring claims for intentional misrepresentation and fraudulent inducement. (ECF No. 60.1, at ¶¶ 134–46 and 157–72.) The Court's Order on Defendants' Motion to Dismiss left for determination only: (1) Plaintiffs' claims for "intentional misrepresentation (fraud) and fraudulent inducement based on the alleged post-APA misrepresentations by Shannon and Jones-Hertzog about PRA's intent to modify the APA," (ECF No. 106, at pp. 17–18); and (2) Plaintiffs' claim that PRA made fraudulent misrepresentations in the LOI. (*Id*. at pp. 17–20.)

**a. Alleged misrepresentations by Shannon and Jones-Hertzog**

96. VHS alleges that "[o]n or around February 8, 2017, PRA's CEO, Colin Shannon, sent an email to Mr. Parthasarathy stating that PRA was 'obviously trying

to get [VHS and/or Mr. Parthasarathy] a contract' to address the milestone timeline issue" and that "[i]n or around May 2017, Ms. Jones-Hertzog represented to Mr. Parthasarathy that she had proposed a revised timeline internally and was awaiting approval." (ECF No. 60.1, at ¶¶ 116–17.) Plaintiffs further allege that despite these representations, "PRA [ ] did not intend to . . . amend the terms of the APA to extend the time for it to do so" (*Id.* at ¶ 124), and "knew its representations to be false when it made them." (*Id.* at ¶ 143.) Plaintiffs also allege that Parthasarathy relied on the misrepresentations that PRA would modify the milestones to continue assisting PRA with development of the Solutions. (*Id.* at ¶¶ 115, 120.)

97. In order to establish a claim for fraud or fraudulent inducement, a plaintiff must prove: (1) false representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in

fact deceive, (5) resulting in damage to the injured party. *Ragsdale v. Kennedy*, 286 N.C. 130 (1974).[8]

98. To qualify as an intentional misrepresentation for purposes of a fraud claim, the misrepresentation must be "definite and specific." *Libby Hill Seafood Restaurants, Inc. v. Owens*, 62 N.C. App. 695, 698 (1983). "An unfulfilled promise is not actionable fraud, however, unless the promisor had no intention of carrying it out at the time of the promise, since this is a misrepresentation of a material fact." *McKinnon v. CV Indus.*, 213 N.C. App. 328, 338 (2011).

99. PRA argues that "Colin Shannon's February 2017 statement was in fact true that PRA was 'trying to get' Plaintiffs a contract amendment," and "there is no evidence that [ ] Shannon acted with a fraudulent intent" via his February 2017 email. (ECF Nos. 113/111, at pp. 25–27.) PRA contends that mere failure to

---

[8] The parties have not discussed which state's substantive law applies to the fraud claims, but make their arguments based on North Carolina law. Generally, North Carolina applies a *lex loci* to determine the law that governs tort claims such as fraud. *Harco Nat'l Ins. Co. v. Grant Thornton LLP*, 206 N.C. App. 687, 692 (2010) ("Our traditional conflict of laws rule is that matters affecting the substantial rights of the parties are determined by lex loci, the law of the situs of the claim . . . . For actions sounding in tort, the state where the injury occurred is considered the situs of the claim."); *Camacho v. McCallum*, 2016 NCBC LEXIS 81, at *17 (N.C. Super. Ct. Oct. 25, 2016) ("The place of the injury is the state where the injury or harm was sustained or suffered—the state where the last event necessary to make the actor liable or the last event required to constitute the tort takes place, and the substantive law of that state applies."). It is unclear from the evidence, and the parties do not indicate to the Court, where Parthasarathy was physically located when the LOI was executed. Given there is some indication that Parthasarathy was situated in New York, the Court has reviewed New York law on fraudulent inducement. *Hogan Willig, PLLC v. Kahn*, 145 A.D.3d 1619, 1620–21, (2016) (stating "[t]he elements of a fraud cause of action consist of a misrepresentation or a material omission of fact which was false and known to be false by [the] defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury." (internal citations omitted)). The Court finds the law on fraud in New York to be substantively similar to North Carolina's law. Therefore, the Court conducts its analysis under North Carolina law.

ultimately agree on amendments to the Milestones does not prove that Shannon's statement was fraudulent. *Id.*

100. Defendants also argue that Jones-Hertzog's representations were not false because Chuck Munn, PRA's in-house counsel, had in fact received a draft of the proposed amendments from Jones-Hertzog. (*Id.* at pp. 27–28.)

101. The Court has reviewed the relevant evidence presented by the parties and concludes that Plaintiffs have failed to produce substantial evidence to create an issue of fact that Shannon's and Jones-Hertzog's statements were not true at the time they were made or that the statements were intended to mislead Parthasarathy. *Dobson*, 352 N.C. at 83 ("A 'genuine issue' is one that can be maintained by substantial evidence."). Instead, the evidence establishes that PRA engaged in several months of negotiations with Parthasarathy regarding potential amendment of the Milestones, but that ultimately the parties failed to reach agreement on the amendments. (ECF Nos. 113/111, at pp. 25–28.)

102. Therefore, to the extent PRA's Motion seeks summary judgment on Plaintiffs' claims of intentional misrepresentation and fraudulent inducement based on statements made by Shannon and Jones-Hertzog, PRA's Motion should be GRANTED.

**b. Alleged fraudulent misrepresentations in the LOI**

103. In its Order and Opinion on Defendants' Motion to Dismiss Amended Complaint, the Court dismissed Plaintiffs' claims for fraud based on *omissions* from the LOI, but held that

the Court notes that PRA has not argued, and the Court does not consider at this time, whether representations contained within a letter of intent executed between two businesses as part of arms-length negotiations can form the basis for a claim for fraud or negligent misrepresentation. The Court has serious questions about the viability of such a claim under North Carolina law, and PRA is not prohibited from making such an argument at another appropriate time in this case. Nevertheless, the Court addresses the arguments that PRA does raise.

*Value Health Sols. Inc. v. Pharm. Research Assocs.*, 2020 NCBC LEXIS 65, *20-21, (N.C. Super. Ct. May 22, 2020). PRA now moves for summary judgment as to Plaintiffs' claims for fraud based on alleged affirmative misrepresentations in the LOI.

104. In the Amended Complaint Plaintiffs allege as follows:

158. VHS and Mr. Parthasarathy agreed to enter into the APA for a relatively small closing payment in reliance on PRA's representations about the existence of a reasonable opportunity to complete the milestones and receive the fixed and variable milestone payments based on the expressed management priorities and development strategy of PRA.

159. After closing, however, as described above, it became apparent that PRA's representations were false and that a reasonable opportunity to complete the milestones did not exist.

(ECF No. 60.1, at ¶¶ 158–59.)

105. Plaintiffs further allege that "PRA knew its representations were false at the time they made them. PRA did not intend to complete the software and sales milestones set forth in Section 2.6 of the APA or to make the fixed and variable milestone payments." (*Id*. at ¶¶ 162–63.)

106. Referring to the language in the LOI that "the ability to earn [the Sales Milestone payments] will last for the first [2, 3, and 4] fiscal years following the closing date," Plaintiffs contend that "PRA's statement of intentions in the LOI was false" and "PRA did not intend for VHS to have any 'ability' to earn the External Sales milestone[s] for the 'full' anniversary periods stated." (ECF Nos. 125/133, at pp. 29–30.) Plaintiffs argue that PRA's lack of intention to provide Plaintiffs with the ability to earn the Sales Milestones is supported by evidence, *inter alia*, that: ███████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████ (ECF Nos. 125/133, at pp. 2–5, 29.)

107. PRA argues that a non-binding LOI cannot form the basis for a fraud claim. (ECF Nos. 113/111, at p. 24). PRA contends that the LOI is titled "non-binding" and contains express language stating: the LOI merely "outlines [PRA's] thinking regarding the possible structure of a Transaction"; that "none of this LOI, any proposal made to the [Plaintiffs], nor the current on-going discussions between the parties are intended to (and shall not) create a legally binding obligation or commitment"; that the "Proposed Terms"—including the statement about Plaintiffs' "ability to earn" consideration based on external sales—are just that: non-binding, "proposed" terms, which, following due diligence, may be captured in a "definitive

agreement to be finalized"; and that "any business decision either party makes in anticipation of " a final agreement "is at the sole risk of the party making the decision." (*Id*. at pp. 24–25.) In support of its argument, PRA cites *Triad Packaging, Inc. v. SupplyOne, Inc.*, 597 Fed. App'x 734, 739-40 (4th Cir. 2015) (applying North Carolina law and holding that a party's statements regarding the sale price and closing date in a non-binding letter of intent were "classic projections, exemplified by the letter's non-binding nature" and "cannot, therefore, form the basis of a fraud claim").

108. The Court has provided the elements of a claim for fraud above. In addition to establishing fraud, there must be evidence of a misrepresentation of existing or ascertainable fact, as distinguished from a matter of opinion or representation relating to future prospects. *Ragsdale*, 286 N.C. at 139 (citing *Berwer v. Insurance Co.*, 214 N.C. 554 (1938)); *Cash Register Co. v. Townsend*, 137 N.C. 652 (1905); *see also Williams v. Williams,* 220 N.C. 806, 810 (1942) (stating that mere unfulfilled promises cannot be the basis of a fraud claim unless the promisor had no intention of carrying out the promise at the time it was made and that proof of non-performance is not sufficient to establish the necessary fraudulent intent).

109. The Court has considered the evidence and the arguments of the parties and concludes that Plaintiffs have failed to establish an issue of material fact, and PRA is entitled to summary judgment on Plaintiffs' claims for fraud and fraud in the inducement arising from the representation that Plaintiffs would have "the ability to earn" the Sales Milestone payments. First, the Court does not believe that the contents of the LOI can form the basis for a fraud claim under the facts present in

this lawsuit. The LOI contains fulsome disclaimers making it clear that its contents should not be relied upon by any party to the transaction, and that any reliance on its terms are solely at the relying party's risk. Under North Carolina law, letters of intent that are expressly non-binding and contemplate a more detailed future agreement between the parties are not binding agreements. *E.g., Regency Ctrs. Acquisition, LLC v. Crescent Acquisitions, LLC*, 2018 NCBC LEXIS 7, *13–14 (Jan. 24, 2018); *JDH Capital, LLC v. Flowers*, 2009 NCBC LEXIS 8, at *15 (N.C. Sup. Ct. Mar. 13, 2009) (finding that the letter of intent at issue was not a binding contract because it, *inter alia*, stated on its face that it was a "letter of intent and that it is not binding," "contemplate[d] the execution of a more complete agreement," and contained "no language inferring an intent to be bound") (citing *Durham Coca-Cola Bottling Co. v. Coca-Cola Bottling Co. Consol.*, 2003 NCBC LEXIS 5, at **23, 32–33 (N.C. Super. Ct. Apr. 28, 2003)); *see also Boyce v. McMahan*, 22 N.C. App. 254, 258 (1974) (holding that the agreement at issue was "made [ ] subject to a more detailed agreement at some specific date to be agreed to by the parties hereto" and was therefore not a binding contract) (internal quotation marks omitted).

110. Second, the "ability to earn" language relied on by Plaintiffs is, by its very nature, a statement of future intent or a "representation relating to future prospects." *Ragsdale*, 286 N.C. at 139. Notably, this language did not make it into the final APA, which is silent as to Plaintiffs' ability to earn the Sales Milestones. (ECF No. 112, at p. 352.)

111. Third, almost all the evidence upon which Plaintiff relies to establish PRA's fraudulent intent is from after the execution of the LOI in October 2014. In

particular, ███████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

███████████████████████████████████████████ which was two months after

the LOI was executed.  Plaintiffs have not produced substantial evidence that raises

an issue of material fact regarding PRA's intent at the time it entered into the LOI.

112.  Finally, Plaintiffs cite no authority from North Carolina or other jurisdictions, and the Court was not able to locate any, in which a court has recognized a claim for fraud arising out of representations contained in a letter of intent.  This clearly is not the case in which this Court should consider recognizing such a claim.

113.  Therefore, to the extent PRA's Motion seeks summary judgment on Plaintiffs' claims of intentional misrepresentation and fraudulent inducement based on representations contained in the LOI, PRA's Motion should be GRANTED.

3.  Violation of UDTPA

114.  Plaintiffs' claim for violation of the UDTPA is a repackaging of their breach of contract and fraud claims.  (ECF No. 60.1, at ¶¶ 173–78.)  Plaintiffs allege PRA engaged in unfair or deceptive practices by fraudulently inducing Plaintiffs to enter into the APA,  falsely promising to amend the Milestones, and by breaching the APA by engaging in conduct to "interfere with, and prevent the completion of the [M]ilestones."  (*Id.* at ¶ 175.)  Here, Plaintiffs' claim turns on whether they have produced sufficient evidence of unfair or deceptive acts by PRA.  Whether an act or practice is unfair or deceptive is ultimately a question of law for the Court. *Songwooyarn Trading Co. v. Sox Eleven, Inc.*, 213 N.C. App. 49, 56 (2011).

115. As a preliminary matter, the Court has dismissed Plaintiffs' claims for fraud and fraudulent inducement, so those claims do not support a claim for unfair and deceptive trade practices. A claim for violation of the UDTPA does not require a separate, actionable, underlying claim for fraud. *See Gress v. Rowboat Co.*, 190 N.C. App. 773 (2008). However, the dismissal of the fraud claims supports the conclusion that Plaintiffs have not produced evidence of deceptive conduct.

116. Further, although a breach of contract accompanied by "substantial aggravating circumstances" can sustain a claim for violation of the UDTPA, *Branch Banking & Trust Co. v. Thompson*, 107 N.C. App. 53, 62 (1992), the Court has dismissed Plaintiffs' claim for breach of the APA.

117. Therefore, to the extent PRA's Motion seeks summary judgment on Plaintiffs' claim for violation of the UDTPA, PRA's Motion should be GRANTED.

*C. Plaintiffs' Motion*

118. Plaintiffs move for summary judgment on only two claims: (a) PRA's remaining counterclaim against Parthasarathy for breach of the Employment Agreement and the Settlement Agreement, and (b) whether the license granted in the Takeda MSA constitutes an "External Sale" under the MSA, potentially entitling Plaintiffs to certain Sales Milestone payments. (ECF Nos. 116/117.1, at pp. 1–2.) The Court will address these claims in turn.

1. PRA's Counterclaim for Breach of Contract Against Parthasarathy

119. Plaintiffs seek summary judgment in their favor on PRA's counterclaim for breach of contract against Parthasarathy. The counterclaim alleges: (1) that Parthasarathy did not use his "best efforts" on behalf of PRA, as required by the

Employment Agreement, because he devoted significant time and effort to forming MGS; and (2) that "Parthasarathy's breach of the Employment Agreement also effectuated a breach of the Settlement Agreement, in which he represented that he had ██████████████████████████████████████████ (ECF No. 37, at ¶¶ 84–91.) In the counterclaim, PRA alleges "[a]s a direct and proximate result of Parthasarathy's breaches of the Parthasarathy Employment Agreement and Settlement Agreement, PRA is entitled to actual damages, including the amount PRA paid to Parthasarathy under the Settlement Agreement, plus attorneys' fees and interest." (*Id*. at ¶ 91.)

120. In North Carolina, a party asserting breach of contract must show "(1) existence of a valid contract; and (2) breach of the terms of that contract." *Cater v. Barker*, 172 N.C. App. 441, 445 (2005) (citing *Poor v. Hill*, 138 N.C. App. 19, 26 (2000)). In construing a contract, the courts are to give full effect to each unambiguous contractual provision. *Singleton v. Haywood Elec. Membership. Corp.*, 357 N.C. 623, 629 (2003) (holding that "various terms of the [contract] are to be harmoniously construed, and if possible, every word and every provision is to be given effect").

121. Our Court of Appeals has held, "[i]n order for a breach of contract to be actionable it must be a material breach, one that substantially defeats the purpose of the agreement or goes to the very heart of the agreement, or can be characterized as a substantial failure to perform." *Supplee v. Miller-Motte Bus. Coll., Inc.*, 239 N.C. App. 208, 220 (2015) (quoting *Long v. Long*, 160 N.C. App. 664, 668 (2003)). The question of "[w]hether a breach is material or immaterial is ordinarily a question of

fact[.]" *McClure Lumber Co. v. Helmsman Constr., Inc.*, 160 N.C. App. 190, 198 (2003).

122. It is undisputed that the Employment Agreement and Settlement Agreement are valid contracts. It also is undisputed that Parthasarathy helped found, served on the board of directors of, and did extensive work in furtherance of MGS while still employed by PRA, and that Parthasarathy neither disclosed his involvement with MGS to Shannon or PRA, nor sought PRA's consent to engage in his activities with MGS. Parthasarathy's activities for MGS are at least arguably breaches of the unambiguous obligations contained in sections 3(a)(i) and 3(a)(ii) of the Employment Agreement.

123. Plaintiffs argue that the only breach of the Employment Agreement and Separation Agreement that PRA is now pursuing is Parthasarathy's failure to get Shannon's consent to serve on the MGS's board of directors. (ECF Nos. 116/117.1, at pp. 10–11.) Plaintiffs contend that PRA's Rule 30(b)(6) corporate witnesses on the breach of contract counterclaim, Irene, testified that the

> sole basis for PRA's "best efforts" counterclaim against Mr. Parthasarathy is his failure "to inform PRA if he were on the board of another company" and that PRA "not aware of performance reasons for the counterclaim" and does not claim that Mr. Parthasarathy's claimed failure to give notice had any impact on his performance of his job.

(*Id.* at p. 10.) Irene further testified that " ███████████████████████████████████████████████████████████████ " and "'[s]o the counterclaim is for the money paid to [Parthasarathy]. That is what the counterclaim is. It's not an evaluation of his job performance.'" (*Id.*)

124.    Plaintiffs argue that Parthasarathy's failure to notify PRA of his work on MGS does not constitute a material breach such that rescissory damages should be awarded to PRA. (*Id*. at pp. 10–11.) Plaintiffs further contend that "because PRA does not seek any actual damages from the claimed breach, its counterclaim fails and must be dismissed." (*Id*. at p. 11; ECF Nos. 128/138, at p. 4.)

125.    Finally, Plaintiffs argue that no North Carolina statute authorizes PRA's recovery of attorneys' fees and that the "contractual provision PRA relies on is an 'indemnification' clause in the Employment Separation Agreement." (*Id*. at p. 12.)

126.    In response, PRA argues that Plaintiffs' contention that PRA admitted that its counterclaim is based solely on Parthasarathy's failure to notify PRA that he was serving on MGS's board of directors is a "gross" mischaracterization of Irene's testimony, and that Irene testified repeatedly that the counterclaim was based on Parthasarathy's work on behalf of MGS while still employed with PRA as well as his failure to inform Shannon that he served on the board. (ECF Nos. 120/122, at p. 7.) The Court has reviewed the relevant testimony and concludes that PRA is correct; Irene testified on multiple occasions that PRA's claim was based on Parthasarathy's employment with and work on behalf of MSG as well as his failure to notify Shannon. PRA has not limited its breach of contract counterclaim to Parthasarathy's failure to inform Shannon that he was serving on MGS's board of directors.

127.    PRA next contends that it is not seeking the equitable remedy of "recission" of the Settlement Agreement, but instead is seeking as actual damages the amount it paid to Parthasarathy as separation pay. (*Id*. at pp. 8–9.) PRA claims it merely seeks "compensation" for Parthasarathy's breach of the Settlement

Agreement that would place it "in the same position he would have occupied if the contract had been performed." (*Id*. at p. 9.)

128. PRA further argues that it is not required to prove it suffered actual damages to survive summary judgment on a claim for breach of contract. (*Id*. at p. 6.) PRA is correct. *See Midgett v. N.C. State Highway Comm'n*, 265 N.C. 373 (N.C. 1965) ("When plaintiff proves breach of contract he is entitled at least to nominal damages.") (quotation and citation omitted); *Crescent Univ. City Venture, LLC v. AP Atl., Inc.*, 2019 NCBC LEXIS 46, at *127 (N.C. Bus. Ct. Aug. 8, 2019) ("[I]in a suit for damages for breach of contract, proof of the breach would entitle the plaintiff to nominal damages at least.") (citing *Delta Envtl. Consultants, Inc. v. Wysong & Miles Co.*, 132 N.C. App. 160, 172 (1999))); *Comm. to Elect Forest v. Emples. Political Action Comm.*, 260 N.C. App. 1, 6–7 (2018) ("[O]ne has standing to seek nominal damages where some legal right has been invaded but no actual loss or substantial injury has been sustained. Nominal damages are awarded in recognition of the right and of the technical injury resulting from its violation.") (internal quotation omitted).

129. The Court has considered Plaintiffs' arguments in support of entering summary judgment against PRA on its claim for breach of the Employment Agreement and Settlement Agreement and concludes that Plaintiff's Motion on these claims must fail. There is no dispute that the Employment Agreement and Settlement Agreement are enforceable contracts, and there is evidence upon which a finder of fact could find Parthasarathy's activities for MGS were a material breach of at least sections 3(a)(i) and 3(a)(ii) of the Employment Agreement and of representations in the Settlement Agreement. PRA may be entitled to at least

nominal damages for such breaches. Therefore, to the extent that Plaintiffs seek summary judgment in their favor as to PRA's counterclaim for breach of the Employment Agreement and Settlement Agreement, Plaintiffs' Motion should be DENIED.

130. Regarding PRA's counterclaim for breach of the Settlement Agreement, Plaintiffs also argue that PRA cannot recover attorneys' fees from Plaintiffs as a matter of law. Plaintiffs contend that the provision in the Settlement Agreement requiring Parthasarathy to indemnify PRA for its attorneys' fees and costs for pursuing its claim for breach of the Employment Agreement is unenforceable because there is no statute authorizing an award of attorneys' fees. (ECF Nos. 116/117.1, at pp. 11–12.) North Carolina adheres to the "American Rule" that a "successful litigant may not recover attorneys' fees, whether as costs or as an item of damages, unless such a recovery is expressly authorized by statute." *Stillwell Enter. v. Interstate Equip. Co.*, 300 N.C. 286, 289 (1980) (citing *Hicks v. Albertson*, 284 N.C. 236 (1972)); *see also Burr v. Burr,* 153 N.C. App. 504, 506 (2002) ("The recovery of attorney's fees is a right created by statute."); *Wiggins v. Bright*, 198 N.C. App. 692, 695 (2009) ("A trial court cannot award attorneys' fees unless specifically authorized by statute."). This is true "[e]ven in the face of a carefully drafted contractual provision indemnifying a party for such attorneys' fees as may be necessitated by a successful

action on the contract itself." *Stillwell Enter.*, 300 N.C. at 289 (citing *Howell v. Roberson*, 197 N.C. 572 (1929) and *Tinsley v. Hoskins*, 111 N.C. 340 (1892)).[9]

131.  PRA does not contend that there is statutory authority for its claim for attorneys' fees in this case.  Instead, it argues that "[w]here, as here, parties agree to an attorney's fees provision in a settlement agreement, such a provision is enforceable under North Carolina law," citing in support *Ehrenhaus v. Baker*, 243 N.C. App. at 28, and other cases.

132.  PRA misinterprets *Ehrenhaus* and its application to the facts in this lawsuit.  In *Ehrenhaus*, the court held that the defendants' agreement to pay the plaintiffs' attorneys fees in consideration for, and as part of, a settlement agreement resolving pending claims between the parties was permissible even absent statutory authority since North Carolina "recognizes the enforceability of settlement agreements providing for the payment of one party's attorneys' fees by the other party to the lawsuit." *Id.* at 28 (citing *Carter v. Foster*, 103 N.C. App. 110, 114–15 (1991)). The Court recognized "that giving effect to a negotiated settlement agreement providing for the payment of one party's attorneys' fees by the other party is consistent with the well-established policy of encouraging the settlement of disputes between litigants" and does not implicate the public policy concerns addressed by the American Rule.  *Id*. at 27–28 (stating that the "rationale underlying American Rule

---

[9] By statute, North Carolina has created a narrow exception to this rule in circumstances where there are "[r]eciprocal attorneys' fees provisions [contained] in business contracts." N.C.G.S. § 6-21.6.  It is undisputed that the attorneys' fees provision at issue in this case is not reciprocal but, instead, inures only to the benefit of PRA.

is that attorney fee awards against the non-prevailing party have a chilling effect on open access to the courts.") (quotation and citation omitted).

133. Unlike in *Ehrenhaus*, the attorneys' fees provision here, although contained within a document title "Confidential Release and Settlement Agreement," does not require Plaintiffs to pay attorneys' fees in settlement of an existing dispute between the parties. Rather, it is simply a device for requiring Plaintiffs to pay PRA's attorneys' fees in the event PRA pursues a "claim" and proves that Parthasarathy made a misrepresentation regarding his compliance with the terms of the Employment Agreement. In other words, it provides for the payment of PRA's attorneys' fees if PRA is the prevailing party on such a claim. This is easily distinguishable from the type of attorneys' fees agreement enforced in *Ehrenhaus*.

134. The Court has carefully considered the arguments and concludes that the terms of the Settlement Agreement requiring Plaintiffs to pay PRA's attorneys' fees is unenforceable as a matter of law. *GR&S Atl. Beach, LLC v. Hull*, 2011 NCBC LEXIS 38, at *2 (N.C. Super. Ct. Sept. 29, 2011) (stating that attorneys' fees "incurred in litigation between parties are not recoverable by the successful party in the absence of statutory authorization, whether they are claimed as costs or damages and whether or not an agreement between the parties expressly allows for the recovery of such fees"). Accordingly, to the extent Plaintiffs' Motion seeks summary judgment in Plaintiffs' favor dismissing PRA's counterclaim for attorneys' fees and costs, Plaintiffs' Motion should be GRANTED.

2. Plaintiffs' claim that the license ██████████████████████ constitutes an "External Sale" under the APA

135. In the Amended Complaint, Plaintiffs allege that "PRA entered into transactions with ████████████████████████████████████████

█████████████████ under the APA but has failed to pay the variable milestone payments associated with the sales milestone." (ECF No. 60.1, at ¶131.) Plaintiffs now seek summary judgment on the issue of whether the license to access PSO provided by PRA to ███████████████████████████ under the APA.[10]

136. The relevant terms of the Takeda MSA are not in dispute. ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

137. To determine whether the ███████████████████████████, the Court must interpret the meaning of that term as used in the APA. Summarizing Delaware's rules of contract construction, the Delaware Supreme Court held:

---

[10] In its Order on Rule 10.9 Discovery Dispute (ECF No. 82), the Court ordered that "[t]he parties shall include as part of their briefing on motions for summary judgment, . . . argument regarding whether the type of access to ████████████████████████████████ ████████████████████████ (*Id.* at p. 7.)

Clear and unambiguous language . . . should be given its ordinary and usual meaning. Absent some ambiguity, Delaware courts will not destroy or twist [contract] language under the guise of construing it. When the language of a . . . contract is clear and unequivocal, a party will be bound by its plain meaning because creating an ambiguity where none exists could, in effect, create a new contract with rights, liabilities and duties to which the parties had not assented. . . .

A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction. Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings. Ambiguity does not exist where a court can determine the meaning of a contract without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends. Courts will not torture contractual terms to impart ambiguity where ordinary meaning leaves no room for uncertainty. The true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant.

*Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (2006) (quoting *Rhone-Poulenc*, 616 A.2d at 1195–96). "The determination of ambiguity lies within the sole province of the court." *Estate of Osborn,* 991 A.2d 1160.

138. "[W]here the language at issue is clear and unambiguous. . . . the parol evidence rule bars the admission of evidence from outside the contract's four corners to vary or contradict that unambiguous language." *GMG Capital Invs., LLC*, 36 A.3d at 783. "But, where reasonable minds could differ as to the contract's meaning, a factual dispute results and the fact-finder must consider admissible extrinsic evidence. In those cases, summary judgment is improper." *Id.*

139. A contract term or phrase is not ambiguous merely because the parties dispute its proper construction. *Lorillard Tobacco Co.*, 903 A.2d at 73. Rather,

> [i]f parties introduce conflicting interpretations of a term, but one interpretation better comports with the remaining contents of the document or gives effect to all the words in dispute, the court may, as a matter of law and without resorting to extrinsic evidence, resolve the meaning of the disputed term in favor of the superior interpretation.

*Wills v. Morris, James, Hitchens, & Williams*, 1998 Del. Ch. LEXIS 213, *4-5 (Nov. 6, 1998) (citing *E.I. duPont de Nemours v. Shell Oil Co.,* 498 A.2d 1108, 1113 (Del. 1985)).

140. With these rules of construction in mind, the Court turns to the relevant language and provisions of the APA.

141. The APA states, in pertinent part, that External Sale "means the sale of one or more licenses to the Solutions by [PRA] . . . to a third party." (ECF No. 112, at p. 352.) Clin Trial Max, Cloud Max, and Info Max are defined as the Solutions. (*Id.* at p. 349.) The APA provides that Plaintiffs will earn incentive payments for the achievement of the Sales Milestones upon "the achievement of aggregate External Sales" within certain proscribed time periods following the Closing Date. (*Id.* at p. 374.) The Sales Milestones are separate from, and in addition to, the Development Milestones tied to the functionality of the Solutions and their deployment within PRA clinical trial management environment. (*Id.* at pp. 351–52.)

142. Plaintiffs do not argue that the meaning of the term External Sale is unambiguous. (ECF Nos. 116/117.1, at pp. 4, 13–16; ECF Nos. 128/138, at pp. 8–16.) Instead, relying heavily on deposition testimony and other extrinsic evidence,

Plaintiffs contend that the definition of External Sale in the APA is broad enough to "to capture the 'myriad' types of licensing transactions that would permit PRA to commercially exploit the value of the Solutions." (ECF Nos. 116/117.1, at pp. 4, 13–16; ECF Nos. 128/138, at pp. 8–16.) Plaintiffs argue that nothing contained in the definition of External Sale requires that "the transaction between PRA and PRA's customer" has to "be a software sales transaction or memorialized as a licensing agreement." (ECF Nos. 116/117.1, at p. 14.) Plaintiffs argue that "█████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████ (*Id.*)

143. PRA argues that the term External Sale in the APA is unambiguous, and therefore the Court should not consider the extrinsic evidence offered by Plaintiffs. (ECF Nos. 120/122, at pp. 17–24.) PRA contends that the word "sale is generally understood to involve a conveyance of something in exchange for a payment for that which is being conveyed" and cites a dictionary definition of "sale" as "the transfer of ownership of and title to something "for a price." (ECF No. 120/122, at p. 14.) PRA argues that providing its customers ████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

PRA further asserts that Plaintiffs' proposed interpretation would lead to "absurd results" because "[u]nder Plaintiffs' interpretation, PRA would apparently make a 'sale' of [the Solutions] any time it entered into a contract that either i) ████████

████████████████████████████████████ or ii) disclosed on an

exhibit which technology applications PRA might use internally in providing clinical trial services to a customer." (*Id.* at p. 23.)

144. PRA also notes that the Takeda MSA does not expressly use the word sale in connection with the license, and that there is no separate fee attributed to the access to the Solutions. (*Id.*) ██████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

145. The Court begins by assessing the language used by the parties to define the term External Sale in the APA. The key language at issue is "the sale of one or more licenses to the Solutions by [PRA] . . . to a third party." (ECF No. 112.1, at p. 374.) "License" is a familiar term when used in connection with software, typically meaning a limited right to access and use a software product owned by another entity. This meaning generally comports with an accepted dictionary definition of "license" as "a grant by the holder of a copyright or patent to another of any of the rights embodied in the copyright or patent short of an assignment of all rights." *License*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/license (last visited Mar. 30, 2021). As PRA contends, "[a] 'sale' is generally understood to involve a conveyance of something in exchange for a payment for that which is being conveyed." (ECF Nos. 120/122, at p. 14.) A common sense reading of the definition of External Sale strongly suggests that an External Sale contemplates the payment of a specific fee by a customer for the right use of the Solution.

146.    This construction of the definition of External Sale is also consistent with the overall purposes and structure of the APA.  *See E.I. duPont de Nemours v. Shell Oil Co.,* 498 A.2d at 1113 ("In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein. Moreover, the meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan.").  In the APA, PRA purchased all of Plaintiffs' proprietary rights and interests in the Solutions and became the owner of the Solutions.  Part of the compensation for the purchase was structured as incentive payments to Plaintiffs for successfully and timely integrating the Solutions into PRA's clinical trial management environment in order for PRA to better provide services to its customers—services for which it had an established revenue stream. (ECF No. 112.1, at pp. 351–52.)  A second and distinct set of incentive payments were tied to PRA's ability to create a new revenue stream derived from selling licenses to the Solutions to customers.  (*Id*. at p. 352.)  The incentives are expressly tied to the income generated by PRA from selling the licenses, and not an increase in PRA's overall revenue from providing its clinical trial management services caused by PRA's internal use of the Solution.[11]

147.    Plaintiffs and PRA offer differing interpretations of the term External Sales.  However, "[i]f parties introduce conflicting interpretations of a term, but one

---

[11] The Court believes that a sale of a license to the Solutions could occur within an overall services agreement between PRA and its customers if a separate and specific fee were attributed to the license or licenses.

interpretation better comports with the remaining contents of the document or gives effect to all the words in dispute, the court may, as a matter of law and without resorting to extrinsic evidence, resolve the meaning of the disputed term in favor of the superior interpretation." *Wills*, 1998 Del. Ch. LEXIS 213, at *4-5. PRA urges the language "the sale of one or more licenses to the Solutions by [PRA] . . . to a third party" means the sale of a right to access and use the Solution for a specific payment In this case, PRA has offered the "superior interpretation" of the meaning of External Sale as being the grant of a license by PRA to a third party to use the Solutions in exchange for a specific fee or payment attributable solely or separately to the license. The Court concludes that the term External Sale is unambiguous and is not "fairly susceptible of different interpretations," and "a reasonable person in the position of the parties would have thought [External Sales] meant" the grant of license by PRA to a third party to use the Solutions in exchange for a specific fee or payment attributable solely or separately to the license. *Lorillard Tobacco Co..*, 903 A.2d at 739.

148. Accordingly, to the extent Plaintiffs seek summary judgment in their favor in finding that the ███████████████████████████████ within the meaning of the APA, Plaintiffs' Motion should be DENIED. To the extent PRA's Motion seeks summary judgment on Plaintiffs' claim that the ███████████ ███████████████████ within the meaning of the APA, PRA's Motion should be GRANTED.

## IV.  CONCLUSION[12]

THEREFORE, IT IS ORDERED, as follows:

1.  PRA's Motion is GRANTED.

2.  To the extent Plaintiffs' Motion seeks summary judgment in Plaintiffs' favor as to PRA's counterclaim for breach of the Employment Agreement and Settlement Agreement, Plaintiffs' Motion is DENIED.

3.  To the extent Plaintiffs' Motion seeks the entry of summary judgment in Plaintiffs' favor dismissing PRA's counterclaim for attorneys' fees and costs, Plaintiffs' Motion is GRANTED.

4.  To the extent Plaintiffs' Motion seeks the entry of summary judgment in Plaintiffs' favor finding the ███████████████████████████ within the meaning of the APA, Plaintiffs' Motion is DENIED.

5.  To the extent PRA's Motion seeks summary judgment on Plaintiffs' claim that the ████████████████████████████ within the meaning of the APA, PRA's Motion is GRANTED.

---

[12] PRA also seeks summary judgment on its argument that the APA requires that claims arising under the APA be tried to the Court without a jury and not to a jury, and that Plaintiffs waived their right to a jury trial.  (ECF No. 110, at p. 5.)  Since the Court has dismissed Plaintiffs' remaining claims, the argument is moot.  Therefore, to the extent PRA's Motion seeks summary judgment on this argument, PRA's Motion is DENIED without prejudice.

SO ORDERED, this the 5th day of April, 2021.


                                              /s/  Gregory P. McGuire
                                              Gregory P. McGuire
                                              Special Superior Court Judge for
                                              Complex Business Cases